68 U.S. 384 (1863)
1 Wall. 384
MEYER
v.
THE CITY OF MUSCATINE.
Supreme Court of United States.

*390 The case was submitted on briefs of Mr. Cook for the bondholders, and of Mr. Richman and Butler for the city of Muscatine.
Mr. Justice SWAYNE delivered the opinion of the court:
The demurrer brings under examination the objections taken by the defendant to the validity of the coupons upon which this suit is founded.
These objections will be considered as we proceed.
I. "That there is no authority in the charter of the city of Muscatine under which money may be borrowed to aid in the construction of railroads."
The charter gives the city authority "to borrow money for any object in its discretion, if at a regularly notified meeting under a notice stating distinctly the nature and object of the loan, and the amount thereof, as nearly as practicable, the citizens determine in favor of the loan, by a majority of two-thirds of the votes given at the election."
When the bonds and coupons were issued, the acts of the legislature of Iowa of the 25th of January, 1855,[*] were in force. These acts in connection with the provision of the charter furnish, in our judgment, a conclusive answer to this objection.
The effect of the acts was considered in the case of Gelpcke et al. v. The City of Dubuque,[] decided at this term, to which we refer.
*391 II. "Because the interest was made payable in New York city, instead of at the treasury of the city of Muscatine."
It was according to the general usage to make such bonds and coupons payable in the city of New York. It added to the value of the bonds and was beneficial to all parties. No legal principle forbids it. The power of a municipal corporation to make any contract, does not depend upon the place of performance, but upon its scope and object. A city authorized to establish gas-works and water-works, and to gravel its streets, may buy water, coal, and gravel, beyond its limits, and agree to pay where they are found or elsewhere. The principal power, when expressed, draws to it by necessary implication, the means of its execution. This is a settled rule in the construction of all grants of authority, whether to governments or individuals. If the subject admitted of doubt, we should hold that the city, having acted upon its own construction, and drawn in others to take the securities and advance their money upon it, is now concluded from denying that construction to be the true one.[*]
III. "Because in the stipulation to pay the interest semi-annually at the rate of ten per cent., the authority conferred by the vote which limited the rate of interest to `not higher than ten per cent. per annum,' was transcended, and a usurious rate agreed to be paid."
This objection has no foundation. When a statute fixes the rate of interest per annum, it has always been held that parties may lawfully contract for the payment of that rate, before the principal debt becomes due, at periods shorter than a year.[]
IV. "Because the stock of the Mississippi and Missouri Railroad Company, for which said bonds and coupons were issued, was, without authority from the city, placed in the hands of a trustee, and entirely beyond its control."
This objection, though urged in the argument, does not arise upon the record. All that appears touching the subject is, that the bond of $1000, as set out in the exhibit attached *392 to the complaint, besides binding the city to pay, provides that the holder, upon surrendering it at any time before maturity "to A.C. Flagg, trustee," should be entitled to ten shares of the stock of the railroad company. To such an arrangement there is no legal objection. The city had a right to apply the stock for which the bonds were given, or its proceeds, at any time, in discharge of the bonds.
V. "Because, under the authority to borrow a sum of money, no money was ever borrowed by the city; but instead, these bonds were delivered to the officers of the Mississippi and Missouri Railroad Company, and by their agents and brokers sold to the plaintiffs at a price greatly below their par value."
The amended answer avers, "That the said bonds were by the officers of said railroad company, and their agents and brokers, sold to the plaintiffs at a price greatly below their par value; that at the time said bonds and coupons were received by said plaintiffs, they had full knowledge of the fact that said bonds had been issued for the purpose of aiding in the construction of said Mississippi and Missouri Railroad."
The city was authorized to issue the bonds in order to borrow money to pay for the stock. If the company chose to receive the bonds in payment for the stock, retaining a lien on the stock until the bonds were paid, there was no legal obstacle in the way of their doing so. The object of issuing the bonds was thus accomplished, and no injury was done to those who were to pay them. It is neither averred in the answer, nor claimed in the argument, that the railroad company took them at less than their face. It does not appear that any one objected then, and no one can object now. After the bonds passed into the hands of the railroad company, the company was at liberty to sell them on such terms as it might deem proper.
The act of January 25, 1855,[*] by a clear implication, authorizes cities to give their bonds in payment of their subscriptions of railroad stock, and expressly authorizes the *393 bonds to "be sold by the company at such discount as may be deemed expedient." What is implied has the same effect as what is expressed.[*]
VI. "The ordinance on which the vote for a loan was taken was void, because it submitted three distinct propositions in one, and in such a manner as to cut off an effective opposition from all voters who were against the whole of the propositions."
The record shows that all the votes cast, except five, were in favor of the loan. The city and citizens adopted and acted upon the ordinance as valid and sufficient. The citizens voted, and the city authorities issued the bonds. No one interposed to prevent their issue. It is not questioned that all the parties acted in good faith, and the city can not now be heard to object to the regularity of its own proceedings. A party taking the bonds was bound to look to the legal authority under which the public agents acted. If that were sufficiently comprehensive, he had a right to presume that those empowered to act and acting under it had complied with its requirements.[]
VII. "It is insisted that the legislature had no constitutional power to authorize the issue of such bonds, and that hence they are void."
This is sufficiently answered by the opinion of this court in Gelpcke v. City of Dubuque, decided at this term.[]
The judgment below must be reversed, and the cause remanded for further proceedings, in conformity to this opinion.
JUDGMENT ACCORDINGLY.
Mr. Justice MILLER, dissenting:
I dissent from the judgment and opinion of the court just delivered.
In the case of Gelpcke v. City of Dubuque, decided at this term,[§] I have given the reasons which I thought required *394 this court to follow the recent decisions of the Supreme Court of Iowa, in holding that all bonds given by municipal corporations for stock in railroad companies were void, for want of any constitutional authority in the legislature of that State to enact the laws under which said bonds were issued. I do not now propose to add anything to what I there said upon that subject, but refer to it as fully applicable to the present case.
In the case now before us, however, it is not claimed that there was any act of the legislature authorizing the city of Muscatine to take stock in railroad companies. The principle on which the validity of the bonds is sustained is, that the charter of the city confers on it an unlimited right to borrow money, and that having issued its bonds, which have been sold in the market, they must be held to be valid, although the purchaser knew they were issued for railroad stock.
The plea of the defendant is, that the city of Muscatine "had no authority to assist in building a railroad, or to take stock in the same, nor to issue the bonds of the city to pay for stock in the same," and that at the time said bonds were sold to plaintiffs by the officers of the railroad company, they had full knowledge that said bonds had been issued for the purpose of aiding in the construction of the Mississippi and Missouri Railroad. The plaintiffs demurred to this plea, and the District Court overruled the demurrer. This court holds the plea to be bad, and the demurrer well taken.
The authority to borrow money by the city of Muscatine is found in the 19th section of its charter. That section undertakes to enumerate, in sixteen subdivisions, all the powers intended to be conferred on the City Council. They are those which are usually conferred on such bodies, and none others.
Among them is the authority to establish fire companies, and provide them with engines, to build wharves, to provide for the establishment and support of schools, to audit all claims against the city, to establish the grade of streets and alleys, and wharves, and to cause them to be paved. The *395 fifteenth subdivision is in the following language: "To borrow money for any object in its discretion, if at a regularly notified meeting, under a notice stating distinctly the nature and object of the loan, and the amount thereof, as nearly as practicable, the citizens determine in favor of the loan, by a majority of two-thirds of the votes given at the election."
It seems to me that the discretion here confided to the council as to the objects for which money may be borrowed, must be construed in one or the other of two modes.
1. That the discretion is in its largest sense unlimited, except by the voice of two-thirds of the voters. This construction would authorize the city to borrow money to enter into the banking business, to speculate in gold, or flour, or grain, or to establish mercantile houses, or to build steamboats, and enter into the trade which flows past the city, on the waters of the Mississippi River, or to organize mining companies in Colorado. In short, to take the money or property of the citizen against his will, and employ it in any of the diversified pursuits by which the individual man makes, or fails to make, money.
A proposition which leads directly to such consequences cannot be supposed to have entered, for a moment, into the minds of the legislature. It makes every man's entire property, within the limits of the city, the common property of the community, and converts the citizen, against his will, into a member of one of those Shaker or French communities in which the individual merges his rights into those of the association. No such construction can be tolerated, unless it is impossible that the legislature could have meant nothing else.
2. That the objects on which this discretion may be exercised must be limited to the execution of some of the powers granted in the charter.
I do not propose to cite the numerous authorities which settle that, as matter of law, this is the rule of construction applicable to the case. It is so well known that it would be a waste of time to refer to adjudged cases.
To establish fire companies, and provide them with engines, *396 is a proper and indeed a necessary object to which the money or the credit of the city may be applied. The building of wharves also requires more money than can be well levied at one tax in such a town as Muscatine. And in building school-houses, and other expenditures necessary to establish schools, the citizens may well be consulted, whether the credit of the city may be used. So of grading and paving the streets of the city. All these are purposes, and perhaps there are others enumerated in the act, about which this discretion may well be exercised. It is not necessary, then, to impute to the legislature the injustice and absurdity of intending the first construction of the charter above mentioned. Here are certain powers conferred, objects to be accomplished by the council named in fourteen paragraphs. The fifteenth authorizes them to borrow money for any object in their discretion, if sustained by a two-thirds vote of the citizens. Nothing can be more reasonable than to suppose that the discretion so conferred was limited to the objects enumerated in the fourteen preceding paragraphs.
None of these include railroads; nor does any of them include anything from which railroad enterprises can possibly be implied. In order to get the power to borrow money to build railroads, some other authority than that given by this section must be shown. I do not think any such exists, nor has any been pointed to by counsel, unless it be that such a power is inherent in municipal corporations without regard to their charters. I do not think, at this day, any court can be found to hold such a doctrine.
But what is wanting in original power to issue these bonds is supposed to be supplied as a ratification or confirmation of them, by the act of January 25, 1855, which may be seen on page 223 of the Revision of 1860 of the laws of Iowa. This is entitled, "An act regulating the interest on city and county bonds." The first section declares that railroad companies may issue their own bonds at such a rate of interest, and sell them at such discount as may be necessary, and they shall remain legal and binding. Section 2  the one relied on in this case  is as follows: "That whenever any company shall *397 have received, or may hereafter receive the bonds of any city or county, upon subscription of stock by such city or county, such bonds may have interest at any rate not exceeding ten per cent., and may be sold by the company at such discount as may be deemed expedient."
It is obvious that the whole purpose of the statute was to relieve such bonds as might have been, or might hereafter be issued, from liability to the charge of usury. This is not the language in which the legislature or any one else would undertake to make valid bonds, issued without any authority whatever in the municipal body. The bonds in this case were issued before the act passed. It says never a word about ratifying them or confirming them, or making good the want of power to issue them. It is said, however, that the act itself implies that there was authority to issue such bonds in the cities and counties. This is a clear non sequitur. An examination of the acts of the legislature will show that the cities of Dubuque, of Keokuk, of Davenport, and perhaps many others, had been authorized by the legislature to take stock in railroads, and to issue bonds in payment of it, and the Supreme Court of the State had then twice decided that, by a general law, all the counties in the State could do so.
These cities, then, and all the counties having the authority to issue bonds for stock, and some of them having done so, and others intending to do so, the legislature meant no more than to say, that in the cases where they had been, or might hereafter be issued lawfully, in other respects, they should not be held usurious because of the rate of discount at which they might be sold.
To infer from this act that the legislature intended to make valid the bonds of the city of Muscatine, issued without any authority, is a stretch of fancy, only to be indulged in railroad bond cases, and which it is hoped may be confined to them as a precedent. The act applies to bonds issued after its passage as well as before, and in precisely the same terms. Its effect is the same on both. Now will it be urged that this was intended to confer on all the cities whose charters had theretofore denied them such power, the right to take *398 stock in railroad enterprises? Is this the language in which an act of such importance, and affecting so many persons and so much property, would be framed? Yet it is by such latitudinary construction of statutes as this that it is attempted to fasten upon owners of property, who never assented to the contract, a debt of twenty millions of dollars, involving a ruin only equalled in this country by that visited upon the guilty participants in the current rebellion.
NOTES
[*] Chaps 128 and 149.
[] Ante, 220, No. 81, note.
[*] Van Hostrup v. The City of Madison, ante, p. 291.
[] Mowry v. Bishop, 5 Paige, 98.
[*] Chap. 128.
[*] United States v. Babbit, 1 Black, 55.
[] Commissioners of Knox Co. v. Aspinwall, 21 Howard, 589. [And see Mercer Co. v. Hacket, ante, 83. REP.]
[] Ante, 175. See also Rowan et al. v. Runnels, 5 Howard, 134; Pease v. Peck, 18 Id., 599; State Bank of Ohio v. Knoop, 16 Id., 392; Jefferson Branch Bank v. Skelly, 1 Black, 43C.
[§] Ante, p. 175.