### MANHATTAN CO. et al. v. CITY OF IRONWOOD.

(Circuit Court of Appeals, Sixth Circuit. May 12, 1896.)

#### No. 397.

1. MUNICIPAL BONDS—RECITALS—AUTHORITY TO ISSUE.

When municipal bonds recite upon their face that they are issued in accordance with the provisions of a particular act of the legislature, and that certain steps required by such act to be taken, as a condition of their issue, were taken at a time when the act itself shows they could not legally be taken, such bonds are invalid, even in the hands of a bona fide purchaser for value. McClure v. Township of Oxford, 94 U. S. 429, followed.

2. SAME—CHARTER OF IRONWOOD, MICH.

Upon consideration of the various provisions of the act reincorporating the city of Ironwood, Mich., passed February 24, 1893 (Local Acts Mich. 1893, No. 235), *held,* that the power to issue bonds, and to initiate proceedings for a vote upon such issue, conferred by chapter 9, § 9, of the act, was one that could be exercised only by the new officials of the city, as reincorporated under the act, to be chosen at the first election, directed by the act to be held on April 3, 1893, which election was neither an annual nor special election, within the meaning of said chapter 9, § 9, and accordingly that bonds reciting that they were issued under the authority of chapter 9, § 9, of said act, pursuant to a vote of the qualified electors at an election held for the purpose on April 3, 1893, disclosed upon their face that they were not legally authorized, and were invalid even in the hands of a bona fide holder for value.

In Error to the Circuit Court of the United States for the Western District of Michigan.

This was an action in assumpsit on 70 coupons attached to 70 bonds issued by the mayor, city clerk, and city comptroller of the

city of Ironwood, Mich. The coupons were for $30 each, and the amount claimed was $2,100. The bonds were in the following form, except as to the numbers and times of payment thereof:

United States of America.

No. 149. The City of Ironwood. $1,000.

Organized under the Laws of the State of Michigan.

Public Improvement Bond.

Know all men by these presents, that the city of Ironwood, in the state of Michigan, hereby acknowledges itself indebted, and for value received promises to pay, to the bearer hereof, the sum of one thousand dollars, in gold coin of the United States of America, of the present standard of weight and fineness, at the First National Bank, in the city and state of New York, on the first day of August in the year nineteen hundred and thirteen (1913), with interest thereon at the rate of 6 per cent. per annum from date, payable on the first days of February and August in each year, in like gold coin, at the said First National Bank, on the presentation and delivery thereto of the coupons hereto annexed, as they severally become due. This bond is issued by said city in accordance with a resolution passed by the common council thereof on the 5th day of September, A. D. 1893, and also in accordance with the provisions of section 9 of chapter IX. of Act No. 255 of the Local Acts of 1893 of the legislature of the state of Michigan, providing for the bonding of said city for paying the floating indebtedness and making public improvements, and authorized by a vote of a majority of the qualified electors of said city voting at an election held for that purpose on the 3d day of April, 1893, under and in accordance with the provisions of the charter of said city, providing for the issue of bonds, and all of which said provisions have been fully complied with, in the issuance thereof. In witness whereof, the said city of Ironwood has executed this bond, by causing its mayor and city clerk to sign their names hereto under the resolution aforesaid, and by causing the city comptroller to countersign the same, and to affix the seal of said city thereto. Done at the city of Ironwood, in the state of Michigan, this first day of August, A. D. 1893.

City of Ironwood, Wm. Trebilcock, Mayor.
[Seal.]
Gogebic County, Mich. John Evans, City Clerk.
Countersigned:
Chas. W. Curran, City Comptroller.

The reference in the bonds to Act 255 of Local Acts of 1893 was a clerical error. It should have read, "Act 235 of the Local Acts of 1893,"—a mistake which could have easily been seen by any one consulting the volume of local acts of that year. It appeared from the evidence that these bonds were part of an issue of 150 $1,000 bonds sold by the city of Ironwood to the broking and banking firm of Coffin & Stanton, of New York, under a contract which was entered into by the mayor and common council of the city of Ironwood by their acceptance of the following proposition:

To the Mayor and Common Council of the City of Ironwood, Michigan— Gentlemen: We will purchase $150,000.00 of city of Ironwood six per cent. public improvement bonds, dated August 1, 1893, paying for the same $145,-275.00; the said $145,275.00 to be deposited with us to the credit of the city, and to be paid out as follows: $25,000.00, on the delivery of the $150,000.00 bond issue; $25,000.00, thirty days after date of first payment; $15,000.00, sixty days after date of first payment; $15,000.00, three months after date of first payment; $20,000.00, four months after date of first payment; $20,000.00, April 15th, 1894; $25,275.00, May 15th, 1894. Bonds to be accompanied by satisfactory papers as to due issuance, statement of debt, population, and assessed valuation. Coffin & Stanton, New York.

After Coffin & Stanton had paid the first $25,000 due on this contract, and received the bonds, they hypothecated them with the plaintiffs, the president and directors of the Manhattan Company, who are a banking corporation of the state of New York, to secure a loan of $50,000 then made, and to secure any loans which might be then due, or should thereafter become due, on other loans from Coffin & Stanton to the bank. Before the city of Ironwood could secure a second payment from Coffin & Stanton, they became insolvent, and made an assignment for the benefit of creditors. No interest has been paid by the city on the bonds. The court below directed a verdict for the defendant on the ground that the popular election from which the common council and the various city officers assumed to derive authority to issue the bonds, held, as recited in the bonds, on the 3d day of April, 1893, was an election at which it was not within the corporate power of the electors of the city of Ironwood to confer, by their votes, authority for this purpose. This writ of error is brought to review the judgment entered upon the verdict thus directed. Chapter 9, § 9, was the particular section of the act of 1893 claimed to authorize this issue. That part of it material here was as follows:

First. The council may provide for the payment of all bonds that have been heretofore issued as they shall mature. Second. The common council may provide, by bonding the city, for the payment of the present floating indebtedness of said city, as hereinafter in this section provided. Third. The common council may purchase of the Ironwood Water Works Company, and the Hurley Water Company, a corporation, all the water pipe owned by said companies and now laid in the streets and alleys and other public places of said city; also purchase the stock, rights, privileges and franchises of said Ironwood Water Works Company and said Hurley Water Company, and the said common council may provide for the payment of such pipes, stock, privileges and franchises by bonding said city except as hereinafter provided. Fourth. To enable the common council to fully and effectually carry out and perform the powers conferred upon them by this section, and to make additional public improvements, they may borrow money at a rate of interest not to exceed six per cent per annum and issue the bonds of the city therefor; signed by the mayor and city clerk and countersigned by the comptroller, but no money shall be borrowed for a longer period than thirty years, and the question of making any loan shall be submitted to the qualified voters of said city at some annual or special election called for that purpose in the same manner as other special elections are called under this act; but before any loan of money shall be authorized by a vote of such electors of said city written or printed notice shall be posted by the clerk in at least three public places in each ward, specifying the object or objects for which money is proposed to be borrowed. The common council may provide by ordinance, the manner of voting upon any question of borrowing money, but the votes shall be canvassed in the same manner, as the result of other votes are canvassed by the provisions of this act.

The act was passed February 24, 1893, and was, by its terms, to take immediate effect. The city of Ironwood had been organized out of the village of Ironwood by a local act or charter passed in 1889, and this charter was amended in some respects by a local act in 1891. Both the acts of 1889 and of 1891 were repealed by the act of 1893. The title of the act of 1893 was, "An act to re-incorporate the city of Ironwood in the county of Gogebic and to add territory thereto and to repeal all acts and parts of acts inconsistent herewith."

Chas. E. Rushmore, for plaintiffs in error.

Jas. C. Flanders and Chas. E. Miller, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The case turns on the construction of the charter of the city of Ironwood, passed in 1893. We may assume, without deciding, that the officers of the city who signed these bonds had implied power, by virtue of the charter's provisions, to recite in the face of the bonds that the requirements of the act in the issuance of the bonds had been complied with, and thus to estop the city from denying the performance of the conditions precedent to the valid issue of the bonds, as against a bona fide purchaser of them without notice. The contention on behalf of counsel for the city is that the bonds recite on their face a fact which must invalidate them. They recite that the bonds were issued in accordance with the provisions of section 9, c. 9, of Act 235 of the Local Acts of 1893, and were authorized by a vote of a majority of the qualified electors of the said city voting at an election held for that purpose on the 3d day of April, 1893, under and in accordance with the provisions of the charter of said city providing for the issuance of the bonds, and that all of said provisions have been fully complied with. If reference to this act shows that the common council of the city of Ironwood could not have been authorized to issue the bonds by a popular election held upon the 3d day of April, 1893, then it must follow that the bonds are void in the hands even of the bona fide purchaser. This is clearly established by the case of McClure v. Township of Oxford, 94 U. S. 429. The bonds in that case were issued by the township of Oxford, Kan., bearing date April 15, 1872, and recited that they were issued under an act of the legislature of Kansas, approved March 1, 1872, authorizing the township to subscribe for stock in the Oxford Bridge Company, and in pursuance of a vote of the qualified electors of said township at an election held therein April 8, 1872. They were adjudged by the supreme court to be void, because the act referred to took effect, by its terms, only from its publication in the Kansas Weekly Commonwealth, which did not take place until March 21st, and it thus appeared that the election could not have been held pursuant to a notice of 30 days, as required by the act. Said Mr. Chief Justice Waite, speaking for the court:

"No valid notice of an election could be given until the act went into effect, because until then no officer of the township had authority to designate time or place of holding it. These bonds therefore carried upon the face unmistakable evidence that the forms of the law under which they purported to have been issued had not been complied with, because thirty days had not elapsed between the time the law took effect and the date of the election. If a purchaser may be, as he sometimes is, protected by false recitals in municipal bonds, the municipality ought to have the benefit of those that are true. This suit was brought upon coupons detached from the bonds purchased by the plaintiff in error before maturity, but upon their face they refer to the bonds, and purport to be for the semiannual interest accruing thereon.

This puts the purchaser upon inquiry for the bonds, and charges him with notice of all they contain."

It is hardly necessary to refer to other cases to establish the principle that all persons dealing with municipal bonds are bound to take notice of the provisions of the statutes under which such bonds purport to have been issued. A few of them are as follows: Northern Bank of Toledo v. Porter Tp. Trustees, 110 U. S. 608, 4 Sup. Ct. 254; McClure v. Oxford, 94 U. S. 429; Anthony v. Jasper Co., 101 U. S. 693; Lake Co. v. Graham, 130 U. S. 674, 9 Sup. Ct. 654; German Sav. Bank v. Franklin Co., 128 U. S. 526, 9 Sup. Ct. 159; Dixon Co. v. Field, 111 U. S. 83, 4 Sup. Ct. 315.

We come now to the question whether, under the 1893 charter of the city of Ironwood, authority could have been derived from a popular election held upon the 3d of April, 1893, to issue bonds under chapter 9, § 9, of that charter. The act was passed February 24, 1893, and, by its terms, took immediate effect. It repealed all former acts in relation to the city of Ironwood. It was entitled "An act to re-incorporate the city of Ironwood." It added to the territory of the old city, and created two additional wards. It provided that the city should "exercise all the powers in this act conferred." It directed that the first election under the act should be held April 3, 1893. It did not in terms continue the officers and common council of the old city in office, but it imposed duties on them in respect to the election of their successors which necessarily implied that they retained official power for some purposes, at least. The argument for the plaintiffs in error is that, as all the powers of the new city were conferred by words of present grant, they were to be exercised by and through the old council and officers as long as they remained in office, as well as by the new council and officers to be selected at the election of April 3, 1893. It is said that the new city, with all its powers, came into being on February 26th; that the power to issue bonds was one of the most important of these; and that section 9, c. 9, conferring this power, was as much in operation February 26, 1893, as upon May 1st of the same year. A careful consideration of the entire act, which embraces 17 chapters, of many sections each, and is much too long to be quoted, convinces us that while the act took immediate effect, and the powers therein conferred were presently conferred upon the new city, most of them which were new and different from those exercised by the prior corporation were only to be exercised through the instrumentality of the new official organization to be provided by the first election to be held under the act. The old city organization was continued during the interval between the passage of the act and the qualification of the new officers to be elected, for police and other necessary purposes, such as the holding of the first election. The old ordinances were expressly kept in force until amended or repealed "by the common council established by this act." This phrase doubtless refers to the new council established by the act, rather than to the old council, the vitality of which was continued by implication only. It follows that the old common council had no power of repealing or amending the old ordinances. If it had no

power to repeal or amend ordinances, it is not to be supposed that it had the power of initiating new municipal legislation. At least, in the absence of express authority, this is not to be implied. All the powers conferred upon the common council by the new act, which involved the enactment of ordinances, could therefore be exercised only by the new council. The power to submit the question of issuing bonds, under section 9, c. 9, to a popular vote, was one in the exercise of which the common council had to pass an ordinance formulating the question and the mode of its submission. Therefore it could not be exercised by the old council at all.

An argument that the old council had the same powers as the new is found in a proviso of the section providing for the appointment of certain officers by the mayor, which expressly forbids their appointment until the new mayor shall be elected. The rule of construction, "Expressio unius est exclusio alterius," is invoked to support the contention that the powers of the old council which were not thus expressly limited were not intended to be limited by implication. The rule relied on is not of universal application, and its aptness depends on circumstances, and the juxtaposition of the contrasted provisions. It often happens that in respect to one class of subjects an express limitation is deemed necessary, ex abundanti cautela, while in respect to another the limitation is thought to be sufficiently implied without an express provision. In such a case the express limitation in one case, instead of weakening the implied limitation in the other, only strengthens it, by indicating the general policy of the lawgiver in relation to both. The proviso with respect to the appointment of the new officers, in our judgment, points with much distinctness to the legislative intent with respect to all the powers conferred by the new act, and strongly tends to show that, while they were given by a grant in præsenti, they were not to be exercised until the first election should give existence to the new organization. Although a minute examination of the act may show necessary exceptions to this general statement, it certainly is true in respect of the power to issue bonds under chapter 9, § 9.

The bonds were required to be signed by the mayor, the city clerk, and the comptroller. Under the old city charter there was no city clerk. His duties were performed by a city recorder. There was no city comptroller under the old charter. Those of his duties which were not new had also been discharged by the city recorder under the previous charter. It is obvious, then, that the old common council could not issue the bonds during its life, because there would be no officers who could execute them. But it is said that the bonds here in question were issued after the new organization, by a vote of the new council, and with the signatures of the new officers. This is true, but the submission to the people of the question of issuing the bonds was in this case directed by an ordinance of the old council. This initial step in issuing bonds was indispensable to their validity, and it is hardly consistent with the plain intention of the legislature to confine the right to issue the bonds to the new council, that the important power of

seeking authority from the people for this purpose should be vested in the ad interim council. At least, such a construction should be based on necessary implications. Instead of this, the language of section 9, c. 9, is quite inconsistent with such a result. By its terms the popular vote was to be taken "at some annual or special election" called for the purpose. Now, the first election under the act was on April 3, 1893, and by that election the old council ceased to be. Therefore the old council had no power to call a special election for the purpose. Nor was the first election under the act to be held April 3, 1893, "an annual election" within the meaning of section 9, c. 9. It came at the same time in 1893 as annual elections were to come in succeeding years, to wit, on the first Monday in April, but it is plainly differentiated from annual elections by several provisions of the act. Chapter 3 makes specific provision for the mode of holding the election of April 3, 1893. It refers to it as "the first election under this act," not as the first annual election. It makes special provision for the selection of election officers by the old council in the old and new wards, and it directs that the notices of registration and election shall be given "by the city recorder of the present city of Ironwood." It directs the mayor and common council "of the present city of Ironwood" to convene the next day after the election, and to "determine the result of the election and what persons were duly elected at the said election to the several offices respectively"; and "the city recorder of the present city of Ironwood" is to file a transcript of this proceeding, duly certified by him, with the county clerk which is to "be sufficient notice of their election to all persons elected." Chapter 5 provides generally for the conduct of annual and special elections, and for the submission of questions to the people at each. By section 13 the council is required to convene on the Tuesday next succeeding the election, and "determine the result of the election upon each question and proposition voted upon and what persons were duly elected at the said election to the several offices respectively"; and the city clerk is required to certify "the result of the election upon any question or proposition voted upon, and what persons are declared elected to the several offices respectively," and to file one certificate in his own office, and another in the county clerk's office. It is thus seen that no provision is made for determining the result of a vote upon any question at the first election, and none for certifying the result, or filing a certificate of it, as evidence, in a public office, although there are specific provisions therefor in the steps prescribed for annual and special elections. It is argued that the requirement that after the first election "the mayor and council of the present city of Ironwood shall determine the result, and what persons were duly elected," is broad enough to include the canvass of a vote on a question submitted. The argument cannot be supported. The result and the persons elected are the same thing. The second phrase is only explanatory of the first. This is clearly shown by the provision that the certificate of this proceeding by the recorder is to be sufficient notice to the persons elected. There is no provision for notice of

the vote upon any question. These considerations convince us that the first election was one for the sole purpose of securing the new organization, conducted in a manner specifically provided to suit the conditions then existing, and that it was not an election at which it was intended by the legislature that any question should be voted upon by the electors. Section 6 of chapter 5 prescribes the hours of the day during which the polls shall be open for elections, and concludes with this sentence: "This section shall also apply to the time of opening and closing the polls at the first election under this act." The use of the word "also" clearly indicates that, according to the legislative terminology of this act, annual and special elections, which were treated of in chapter 5, did not embrace that election which is always and often referred to as "the first election under this act."

Finally, the direction as to the posting of notices of the bond election, contained in section 9, c. 9, could not be complied with until after the new officers were elected and qualified. That section provides that the bonds shall be signed by the city clerk, among others, and that they shall be authorized by an election, and then directs that "written or printed notice shall be posted by the clerk in at least three public places in each ward, specifying the object or objects for which money is proposed to be borrowed." The clerk here referred to is, of course, the city clerk mentioned before in the same section. At the first election under the act there was no city clerk, so that, of course, this provision could not be complied with at the first election. It is said that the officer referred to here is the clerk of the common council, and that as the city recorder, under the old charter, and city clerk, under the new charter, were each ex officio clerk of the common council, the name includes them both, and therefore notices posted by the city recorder for the first election would be a compliance with this requirement. The claim cannot be maintained. Neither the recorder, under the old charter, nor the city clerk, under the new, posted notices of election as clerk of the common council. Each did this as the recording and certifying officer of the corporation. Thus the notices for the first election under the new act were posted by the city recorder as such, and not by him as clerk of the council. And, under chapter 5, notices of annual and special elections for electing officers or voting upon questions were required to be posted by the city clerk as such. It might be that if there were no other grounds than this for holding that the first election was not one at which the vote contemplated by section 9, c. 9, could be held, and if the general policy of the act required it, a court would be justified in treating notices posted by the city recorder as a sufficient compliance with section 9, c. 9, because the city recorder's duties were in many respects those of the city clerk; but where, as in this case, there are many other parts of the act tending to show an intention upon the part of the legislature to withhold an exercise of the bond-issuing power until all the steps required could be complied with by the new official organization of the new city, the requirement that the notices for a bond election should be

posted by an officer to be elected at the first election under the act strongly confirms the conclusion that there was no power in the old council to order the submission of the question of a bond issue to popular vote at that election.

In the light of these conclusions, the election gave no force to the acts of the new officers in issuing the bonds, because not held in accordance with the law by virtue of which, only, the bonds could be authorized. In Allen v. Louisiana, 103 U. S. 80, it was said by the supreme court:

"It is of no importance that two-thirds of the qualified voters of the city gave their assent to the subscription at the election which was called. It has been uniformly held that, until the legislature authorizes an election, a vote of the people cannot be taken which will bind the municipality, or confer upon the municipal authorities the power to make such a subscription. The legislative authority to obtain the popular assent is as essential to the validity of the election as it is to the subscription."

The plaintiffs in error rely upon the contemporaneous construction by the authorities of the new city of Ironwood to support the view that the election so held was a valid one, and that the bonds were properly issued. When the construction of the statute is in grave doubt, it is true that a contemporaneous construction of a local act by those immediately interested will have no slight weight in turning the scale in favor of that construction which will validate the acts of those who are called upon to execute the statute, and who have induced innocent third persons to part with value on the faith of the validity of their acts. Van Hostrup v. Madison City, 1 Wall. 291; Meyer v. City of Muscatine, 1 Wall. 384; James v. Milwaukee, 16 Wall. 159; Savannah v. Kelly, 108 U. S. 184, 2 Sup. Ct. 468; Kirkbride v. Lafayette Co., 108 U. S. 208, 2 Sup. Ct. 501; U. S. v. Moore, 95 U. S. 760–763. But this rule has no application unless the construction is a doubtful one, and the ambiguity which arises from the language is so great as to compel the court to seize upon extraneous circumstances to aid in reaching a conclusion. The present is not such a case. The judgment of the court below is affirmed, with costs.