GLUCOSE SUGAR REFINING CO. v. CITY OF MARSHALLTOWN et al.

(Circuit Court, S. D. Iowa, C. D. March 4, 1907.)

No. 2,436.

1. CONTRACTS—PARTIAL INVALIDITY—SEPARATION.

Where a city, in order to construct a sewerage plant, borrowed $25,000 from complainant to construct the same, and agreed to repay the loan in installments in various ways, a provision of the contract that, in case after the year 1901 the total taxable value of all complainant's property should be fixed and kept at a sum not to exceed $5,000, then complainant for each year in addition to other credits would credit on the loan a sum equal to 14 times the taxes on $5,000, or such proportionate amount in case the valuation exceeded $5,000, was separable from the remainder of the contract, and, if invalid, did not invalidate the balance.

[Ed. Note.—Divisibility of contracts, see note to Saunders v. Short, 30 C. C. A. 467.]

2. MUNICIPAL CORPORATIONS—BORROWING MONEY—SEWERS—CONSTRUCTION—POWERS.

A city having express statutory authority to construct sewers as provided by Iowa Code 1897, §§ 791, 794, 796, 810, 820, 831, 841, had power to borrow money for the purpose of constructing a plant for the disposition of the sewage.

3. SAME—CONTRACTS—VALIDITY—RELIEF FROM TAXATION.

A contract by which complainant agreed to loan defendant city the sum of $25,000 for the construction of a sewerage plant to be repaid by a return of all water rents owing to the city from complainant, together with all taxes due the city on a specified valuation of the company's property, etc., was not objectionable as relieving complainant from the burden of taxation.

In Equity.

G. W. Kretzinger and T. Binford, for complainant.
J. L. Carney and George H. Carr, for defendants.

McPHERSON, District Judge. This case is by a bill in equity and demurrers thereto. The principal recitals of the bill are as follows: The city is of about 15,000 people, on the Iowa river, near which city complainant has a plant or works. In January, 1900, there was pending in the state district court at Marshalltown an action by residents below the city against the glucose company, and suits were threatened against the city for polluting the waters of the river with sewerage and filth.

To avoid those suits, and remedy the evils, complainant by its officers and the city by resolution adopted by its council and approved by the mayor entered into a written contract, which, stated in an abbreviated form, is as follows: There are four "whereases." One is that the city has 15,000 people, and has no adequate means for the proper or scientific disposal of its sewerage and that of its residents

and the factories therein. Another is that said sewerage empties into the said river, and that the people below are complaining. Another recites the pendency of said suit, and that other suits are threatened against the city to enjoin and abate the nuisances. The last "whereas" recites that an urgent and immediate necessity exists for the prompt erection and construction by the city of a suitable plant to care for the sewerage from its residents and said plants, and the health and welfare of the citizens of the city. Following which it was agreed as follows: (1) The glucose company advances for said purposes $25,-000 to be paid to a trustee named. (2) The city was to at once purchase sufficient land and construct and erect a suitable sewerage plant. The glucose company has the right to empty its sewerage therein free of charge, and the trustee out of said moneys was to pay for constructing the sewerage plant on the written orders of the city, and said plants to be constructed under the supervision of the city. (3) The trustee was to take the title to the lands in his name. When the city had fully performed its part of the contract, the trustee was to make a conveyance to the city, but, if the city at any time fails to thus comply, the trustee is to convey to the glucose company for its damages for such breach of the contract, upon the city paying to the glucose company the full amount then remaining unpaid, including the amount the trustee may have in his hands. And the amount not necessary to buy the lands and construct said plant is to be refunded to the company. (4) The city is to have the care, use, and control of the lands and plant, and is to maintain and operate the same, and receive and retain all revenues therefrom. (5) In consideration whereof the city agrees: (a) To refund and rebate to the company until said $25,000, with interest thereon at 3 per cent., is fully paid, all water rents to become owing the city from the company. (b) The city during the years 1900 and 1901 is to refund, rebate, and pay back to the company all taxes due the city from the company on the valuation of the company's property already fixed at $75,000, the amount of which taxes is to be credited on said $25,000. (c) If after the year 1901 the total taxable value of all the company's property shall be fixed and kept at a sum not to exceed $5,000, then the company for each year, in addition to other credits, shall credit on said $25,000 a sum equal to 14 times the taxes on $5,000. But, if the valuation exceeds $5,000, the amount to be credited shall be decreased in proportion as the valuation is increased. (d) The company is not to pay the city any taxes or water rents until the full sum of $25,000 and interest is fully repaid to the company. (6) If the company ceases to operate its plant, or remove its plant from the city, then the trustee may make conveyance to the city of the lands on which the sewerage plant is located. (7) The city may pay to the company at any time the $25,-000, with interest.

Then it is alleged that pursuant to the contract the company loaned for said purposes to the city said $25,000, and that by the action of the city council in making said contract and in accepting the money and ratifying the contract said taxes each and every year and water rentals were thereby appropriated in equal amounts thereto to the payment of the company on account of said loan. But in the year

1902 the county treasurer collected said taxes and paid over to the city its share thereof which the city retains, and it has attempted to repudiate the entire contract, and refuses to pay over the money, although the .company in all respects has complied with and observed said contract. During the years 1903, 1904, and the one-half of 1905 the company paid on account of taxes $14,016.96, and the part unknown to complainant due the city was paid the city by the county treasurer. But to obtain such credit each year would require many actions, and it is. entitled to have the city restrained from collecting said taxes, or, if collected, from appropriating the same without giving credit. And an accounting is asked, and an injunction is asked against levying on or selling any of its property on account of such city taxes. The city, its mayor, and treasurer, and the county treas-· urer are made defendants. Such in a way quite general is the bill in equity which, of· course, is taken as true in all respects on demurrer.·
  The defendants contend that the entire contract is illegal, for the reason, as is urged, that clause "c," paragraph 5, of the contract, is illegal, and that such illegality poisons and destroys the entire contract. Each side has cited many authorities on the question, which I shall not review, for the reason that no one can have doubt as to what the rule is. There can be no difficulty in the case as to the law; the only doubt arising being as to the application of the law to the contract sought to be enforced. The rule is, as stated by Bishop on Contracts, § 487, concurred in by all text-writers, judges, and lawyers, as follows:

"A contract illegal in part and legal as to the residue is void as to all, when the parts cannot be separated. When they can be, the good will stand and the rest will fall. One entire consideration can not, within this rule, be separated, though composed of distinct items, some of which are legal and others illegal."

Each city has an assessor, who assesses all taxable property. After his return is made, the city council raises or lowers such assessments. of individuals and corporations as the facts require. Then the city . makes the levies, which, multiplied by the assessments thus equalized, shows the amount of taxes the city is to have. This in due time goes into the hands of the county treasurer, who collects the city taxes,`. either on voluntary payments, or by sale of the taxpayer's property. When collected, the county treasurer pays over the city taxes to the city treasurer, to be disbursed on vote of the city council. Both the county and city treasurers perform only ministerial duties, and have no discretion. But the city council, the mayor acting therewith, have discretion, both as to equalizing the assessments and appropriating the money. Such being the situation, it is urged that the paragraph "c" is in the nature of a bribe, or otherwise of a corrupting tendency: It is said that the tendency would be to lessen the company's taxes, not only to the city, but to the school district, county, and state, in which the city is not interested other than indirectly except the city taxes. Of course no honest councilman or mayor would be thus influenced, and, if the contract as to paragraph "c" is corrupt, then both the officers of the company and the officers of the city alike were corrupt. Like many other crimes, one alone cannot be guilty. It is a crime requiring parties on both sides to be guilty. And such is

not to be assumed. But whether such clause is a corrupt one, or one against the public policy, need not be determined. In my opinion that clause can be entirely eliminated without interfering with any other feature of the contract. The city desired, and the health, convenience, business, and welfare of the people required, sewers. It had no money. The money was loaned to it by the company. The city was to repay it with interest. Clause "c" was no part of the consideration, which on the one hand was $25,000 and on the other agreeing to use it for sewerage purposes and to repay it. All that can be said is that one of the annual payments was to be made of moneys derived in an unlawful way. Eliminate one of those annual partial payments, and the result in all other respects is the same. Therefore this case will be determined as though clause "c" was not to be found in the contract.

The bill recites that the city borrowed from the company $25,000, to be paid in installments, and that it now has part of the money holding it in trust for complainant, the amount of which is unknown, and that, by insisting on taxing the company, a cloud will be placed on the title to its property and the property sold. The city refuses to recognize the contract or to make payments. All persons agree, or should agree, that a municipality should as rigidly observe its contracts as an individual, and, when it borrows money, it should repay it with the same fidelity that an individual of character does. Aside from the moral phase of the question, in no other way can a standing worthy of credit be maintained. And, when a municipality repudiates its obligations for money borrowed, it only remains for the courts to enforce payment, unless the transaction is an illegal one, or one beyond the powers of the city to contract for. And the question is whether the contract to borrow the money and to create a fund with which to repay it was authorized by law, so that the city could make a valid and binding contract. The city is located on a river. The people below the city in Marshall and Tama counties have the right to use the waters of the river, and to have it unpolluted. The company had already been sued and the city was threatened with suits. Not only so, but the health and welfare of the people of the city required sewers. But, as urgent as the situation was for sewers, it would be worse than an idle performance to construct sewers with the mouths thereof on the commons; so that sewers must either empty into a stream, or the filth carried must otherwise be taken care of. According to the bill, carrying the filth into the stream was such a nuisance to the people below as not to be permitted. Then but the one thing remained, and that was to carry it from the city, take care of it, and protect the people below. If the city had the authority to do this, then the city council, the mayor concurring, was the sole and exclusive judge as to the means of doing it. It is not for a court to sit in judgment on the question of whether the council acted wisely, nor is it for the succeeding council to change the plan as to the method adopted, by declaring the former action unwise, and therefore shall not be paid for. City councils, like men, often borrow money, and expend it with extravagance, and sometimes foolishly. How it was in this case does not yet appear, as the city has not yet answered as to the facts.

This court at this time is only dealing with the question of the power

of a city to borrow money on an agreement to repay. Under Code, §§ 791, 794, 796, 810, 820, 831, 841, and other sections, cities are given the power to construct sewers. Many of those sections are with reference to the procedure, and assessment of adjacent property to pay the expense. But that the city has the power to construct sewers is not debatable. And the power is expressly conferred by statute. And, as incident to that express power, does not the implied power exist to find a suitable mouth for the sewer, and at such place as not to harm the people below? And, if there is an implied power, then it is the same as though recited in express terms in the statute as was held by the Supreme Court in case of Gelpcke v. Dubuque, 1 Wall. 220, 17 L. Ed. 530. And, the city having the power to construct sewers, the power is almost express by section 680 of the Code, where cities are empowered by ordinances to carry into effect its duties and powers to preserve the health and convenience of the people.

But, aside from all this, the duty of the city is to protect and maintain the health and convenience of the people; and that sewers are necessary for the health and convenience of the people need not be discussed. They are not only a convenience, but are a necessity, as all people know in a city of the size of Marshalltown; that is to say, while the sewers and basins need not be of a particular pattern, the filth must be carried off. And it must be carried away, and all the distance away, and not part of the way. And it does not follow that the distance is to be measured in feet and inches. But it is a necessity that it be carried to such place as not to be harmful to others, as well as to remove the causes of pestilence in the city. And in the language of Judge Dillon in his work on Municipal Corporations:

"In doing this, the city must have a choice of means adapted to ends, and are not to be confined to any one mode of operations."

As to the implied powers of a city, in connection with, or in the absence of expressly conferred powers, I am unable to reach any other conclusion than that the city had the power. The authorities are very numerous. Some of the following hold, and the reasoning in others in my judgment conclude, the question. Crawfordsville v. Braden, 28 N. E. 849, 130 Ind. 149, 14 L. R. A. 268, 30 Am. St. Rep. 214; Myer v. Muscatine, 1 Wall. 384, 17 L. Ed. 564; Drexel v. Town of Lake, 127 Ill. 54, 20 N. E. 38; Cochran v. Village, 138 Ill. 295, 27 N. E. 939; Maywood v. Village, 140 Ill. 216, 29 N. E. 704. It is said that there is a legislative construction in conflict with the foregoing by reason of chapter 37, p. 28, Acts 30th Gen. Assem. 1904. That statute expressly conferred the power, but at a date subsequent to the statute. I fully appreciate the force and weight to be given such construction. But we all know that many statutes are enacted to get rid of conflicting holdings of the courts. Others are enacted to make clear that which is in dispute, and just such disputes as we have in the case at bar. Sutherland on Statutory Construction, § 311, says:

"Legislative construction of old laws has no judicial force. Whether right or wrong the courts must determine the proper interpretation from the statutes themselves. A practical construction of a statute of doubtful meaning,

long continued and acquiesced in, and which has operated as a rule of property, and under which many important rights have accrued, will seldom be disturbed." Crawfordsville v. Braden, 28 N. E. 849, 130 Ind. 149, 14 L. R. A. 268, 30 Am. St. Rep. 214; Elliott on Streets, par. 469.

In my opinion the late statute is declaratory of what was regarded as the law by the courts. The contract in suit does not relieve the company from taxation, a scheme so denounced by Justice Miller in speaking for the Supreme Court in Topeka v. Loan Association, 20 Wall. 655, 22 L. Ed. 455. The company was to be taxed, but a credit of like amount was to be made on the obligation. And this plan was upheld by the Iowa Supreme Court in case of Grant v. City of Davenport, 36 Iowa, 396. The Iowa Supreme Court has adhered to that holding many times since, and the courts of other states have many times followed it.

Without discussing the many questions further, I am content with the foregoing.

The several demurrers will be overruled.